Joann MAMMOCCIO, Appellant,

v.

1818 MARKET PARTNERSHIP, Alaska Permanent Fund Corporation, Wilshire Associates, Inc., NMPT–1818, Inc., 1818–GT, Inc., Heitman Pennsylvania Management, Inc., Heitman Financial Services, Ltd.

v.

Amtech Reliable Elevator Co., Appellees.

Superior Court of Pennsylvania.

Argued Jan. 27, 1999.

Filed June 10, 1999.

Reargument Denied Aug. 18, 1999.

Marcy B. Tanker, Philadelphia, for appellant.

Fred T. Magaziner, Philadelphia, for appellees.

Before POPOVICH, SCHILLER and BECK, JJ.

POPOVICH, J.:

¶ 1 This is an appeal from the order entered on June 1, 1998, by the Court of Common Pleas of Philadelphia County, which granted appellees' motion for a new trial. In so ruling, the lower court vacated a jury verdict in favor of appellant in the amount of $1,800,000.00. Upon review, we reverse and remand for entry of judgment in favor of appellant Joann Mammoccio. Further, upon remand, the lower court must consider appellees' outstanding motions for remittitur and appellant's outstanding motion for delay damages.

¶ 2 Herein, appellant questions:

1. Did the trial court err in denying [appellant's] motion to compel the prothonotary to enter judgment and strike [appellees'] Motion for Post–Trial Relief where the [appellees] did not file their motion within ten (10) days of the jury's verdict as required by Pa.R.C.P. 227.1(c)(1)?

2. Did the trial court err in awarding a new trial where the grounds asserted by [appellees] and relied upon by the trial court were not timely and properly raised by [appellees] dur-

ing the trial as required by Pa. R.C.P. 227.1(b)(1)?

3. Did the trial court err and abuse its discretion in awarding a new trial on the ground that the [appellees] did not owe a legal duty to the [appellant]?

4. Did the trial court err and abuse its discretion in awarding a new trial on the ground that there was a lack of a causal relationship between the acts of [appellees] and [appellant's] injuries?

5. Did the trial court err and abuse its discretion in awarding a new trial on the ground that the [appellant's] own negligence caused her injuries?

6. Did the trial court err and abuse its discretion in awarding a new trial on the ground that the verdict was against the weight of the evidence?

Appellant's Brief, P. 3.

¶ 3 Before addressing appellant's first two assertions of error, we will set forth the procedural history of the case. On January 6, 1994, appellant, then 39 years old, sustained serious injuries when she fell from a ladder in a freight elevator shaft in the building located at 1818 Market Street, Philadelphia. At the time of her fall, she was employed as an elevator mechanic by Amtech Reliable Elevator Company ("Amtech").

¶ 4 On September 1, 1994, appellant filed her complaint in which she alleged negligence on the part of appellee 1818 Market Partnership, the owner of the building, and appellee Heitman Pennsylvania Management Inc., the building manager. Appellant's claims were tried before a jury from January 30–February 6, 1998, and the Honorable Paul Ribner of the Philadelphia County Court of Common Pleas presided.[1]

---

1. Appellees joined appellant's employer Amtech as an additional defendant. However, summary judgment was entered in favor of Amtech prior to trial. In addition, defendants

Alaska Permanent Fund Corp., Wilshire Associates, Inc., NMPT–1818, Inc., 1818 GT, Inc., and Heitman Financial Services, Ltd., were dismissed by stipulation prior to trial.

¶ 5   On February 6, 1998, the jury returned a verdict in favor of appellant and against appellees.  The jury found that the appellees were negligent and that their negligence was a substantial factor in causing appellant's injuries.  The jury also expressly determined that appellant was not contributorily negligent.  The jury then awarded damages in the amount of $1,800,-000 to appellant.

¶ 6   On February 11, 1998, appellant filed a petition for delay damages pursuant to Pa.R.C.P. 238.  The petition requested that the jury verdict be molded to reflect the addition of damages for delay in the amount of $408,710.93 for a total verdict of $2,208,710.93.  On February 23, 1998, appellees filed their opposition to appellant's petition for delay damages.  Since the lower court ordered a new trial, appellant's petition for delay damages has not been adjudicated.  *See* Pa.R.C.P. 238(c)(3)(i) (judgment may not be entered on a motion for delay damages until all timely post-trial motions have been decided).

¶ 7   On February 12, 1998, the "Court of Common Pleas Civil Trial Division Civil Trial Worksheet," which was prepared by the trial judge on February 6, 1998, and which set forth the jury's verdict, was docketed with the Philadelphia County Court of Common Pleas.  On February 18, 1998, twelve days after the jury rendered their verdict in open court and before appellees filed their post-verdict motions, appellant filed a praecipe to enter judgment against appellees pursuant to Pa.R.C.P. 227.4(1)(a).  However, the prothonotary refused to do so.  On February 19, 1998, appellees filed their motion for post-trial relief requesting judgment n.o.v., or, in the alternative, a new trial.  That same day, appellant filed a motion to compel the prothonotary to enter judgment and to strike appellees' motion for post-trial relief as untimely filed.  The lower court expressly rejected appellant's argument that appellees' post-trial motions were untimely.

¶ 8   On June 1, 1998, the court entered an order granting appellees' motion for post-trial relief and directing that a new trial be scheduled.  Appellant filed this appeal from that order.[2]

■   ¶ 9   Appellant first complains that the lower court erred in denying her motion to compel the prothonotary to enter judgment on the jury's verdict and strike appellees' post-trial motions.  Upon review, we agree with appellant's assertion that the prothonotary was required to enter judgment in her favor upon the filing of her praecipe on February 18, 1998.  We also agree that appellees' post-trial motions were untimely filed.  However, we do not agree that the lower court was required to strike the motions.

¶ 10   Pa.R.C.P.  227.4(1)(a)  is  clear.  "[T]he prothonotary shall, upon praecipe of a party: (1) enter judgment upon the verdict of a jury ... if (a) no timely post-trial motion is filed[.]"  Pa.R.C.P. 227.1(a) is also clear.  "Post–Trial motions shall be filed within ten days after (1) verdict, discharge of the jury because of inability to agree, or nonsuit in the case of a jury trial[.]"  Presently, appellees did not file their motions for post-trial relief until February 19, 1998, thirteen days after the jury rendered its verdict in appellant's favor.  Therefore, no timely post-trial motion was filed when appellant filed her praecipe on February 18, 1998, the day before appellees' untimely post-trial motion was filed.  Accordingly, the prothonotary was required to perform his ministerial task and enter judgment on the verdict.

¶ 11   The lower court cites *Papalia v. Montour Auto Service Co.*, 452 Pa.Super. 395, 682 A.2d 343 (1996), in support of its holding that the ten day period for filing

<hr/>

2.  The lower court did not expressly deny appellees' request for judgment n.o.v. However, the denial of that motion is implied by the court's grant of a new trial only.  Further, the *motion for judgment n.o.v. is deemed denied* by operation of law.  *See* Pa.R.C.P. 227.4(1)(b).  We note that appellees have not appealed the denial of their request for judgment n.o.v.

appellees' post-trial motions as set forth in Pa.R.C.P. 227.1(c) did not begin to run until February 12, 1998, when the "Civil Trial Worksheet" was docketed with the Philadelphia County Court of Common Pleas. Thus, the trial court submits that appellees' post-trial motion was timely because it was filed only seven days after the "Civil Trial Worksheet" was docketed. We disagree and find that the holding of *Papalia, supra,* does not control the present case.

¶ 12 In *Papalia, supra,* the lower court, pursuant to Pa.R.C.P. 218, granted an involuntary nonsuit against the plaintiffs when they were unprepared to proceed with the trial on October 24, 1994.[3] The order granting the nonsuit was not filed with the prothonotary until November 2, 1994. On November 14, 1994, plaintiffs, pursuant to Pa.R.C.P. 227.1(a)(3), filed a post-trial motion seeking removal of the nonsuit. The lower court denied the motion.

¶ 13 On appeal, the defendant argued that the plaintiffs' appeal should be quashed because they failed to file a timely motion for post-trial relief. We disagreed. Rather, we ruled that the post verdict motion was timely filed because the ten day period for filing a post-trial motion began upon the actual filing of the order granting the nonsuit on November 2, 1994, **not** upon the announcement of the nonsuit by the court. *Papalia,* 682 A.2d at 345.[4]

■ ¶ 14 In the present case, however, a jury verdict was entered in open court before the parties. Pa.R.C.P. 227.1(c)(1) does not expressly require entry of the verdict upon the docket before the ten-day period begins to run, and we will not judicially amend the rule to include such a requirement. In *Papalia,* 682 A.2d at 345, this court cited to Pa.R.C.P. 227.1(c)(1) in making its decision. We are convinced

that said citation was a typographical error since that section only applies to "a nonsuit in the case of a jury trial[,]" and in that case, the nonsuit was granted before trial, pursuant to Pa.R.C.P. 218, due to the plaintiffs refusal to proceed. Rather, we believe the *Papalia* court actually applied Pa.R.C.P. 227.1(c)(2) which provides that "Post Trial motions shall be filed within ten days after . . . (2) notice of nonsuit or the filing of the decision or adjudication in the case of a trial without a jury or equity trial." Thus, the ten-day period could not begin to run until the nonsuit order was docketed and notice was served pursuant to Pa.R.C.P. 236, and the Papalias' post-trial motion was timely filed within ten days from the entry of the order on the docket. *Cf., McCormick v. Blue Cross of Western Pa.,* 360 Pa.Super. 210, 520 A.2d 59 (1987) (where compulsory nonsuit was entered in non-jury trial at the close of plaintiffs' case, ten-day period for filing post-trial motions did not begin to run until the order granting the nonsuit was entered on the docket and notice was sent).

¶ 15 Even if we are incorrect in our assumption that *Papalia, supra,* was actually decided based upon the application of Pa.R.C.P. 227.1(c)(2), we are still convinced *Papalia, supra,* is distinguishable from the present case since we are not dealing with a nonsuit but, rather, entry of a jury verdict in open court. The date upon which the ten-day period for filing post-trial motions begins to run differs between sections (c)(1) and (c)(2) of Rule 227.1, because of the possibility that the parties do not know that a decision (or nonsuit) has been rendered and the ten-day period has begun to run. *See* Pa.R.C.P. 1038 (Trial court, sitting without a jury, shall render his decision within seven days after the

---

3. The nonsuit was granted before jury selection began.

4. Since the ten day period for filing post-verdict motions began on November 2, 1994,

and the tenth day thereafter fell on a Saturday, the motion was timely filed on Monday, November 14, 1994, even though this date was twelve days after the order was filed with the prothonotary. *See* Pa.R.C.P. 106.

conclusion of the trial, except in protracted or extraordinarily complicated cases.).

¶ 16 When, as in the present case, the jury's verdict is announced in open court at the conclusion of the trial, all parties are present and are placed on notice of the verdict. This situation is distinct from that covered by Pa.R.C.R. 227.1(c)(2), where the trial court's decision or order granting a nonsuit may be rendered outside of the parties' presence. Thus, entry of the order on the docket and service of notice on the parties is necessary to insure that the litigants know of the court's decision and have time to prepare a post-trial motion before the expiration of the ten-day period. *See, e.g., Carr v. Downing*, 388 Pa.Super. 195, 565 A.2d 181, 181–82 (1989), *allocatur denied*, 527 Pa. 628, 592 A.2d 1296 (1990) (Ten-day period for filing post-trial motions did not begin to run until the adjudication and decree nisi were filed on the record and the prothonotary served notice of the decision.); *Brednick v. Marino*, 434 Pa.Super. 513, 644 A.2d 199, 200 (1994) (same).

¶ 17 Presently, however, it is undisputed that the parties were present when the jury entered its verdict in favor of appellant, and appellees' post-trial motions should have been filed within ten days of February 6, 1998. Since appellees' motions were not filed until February 19, 1998, they were untimely. Further, since appellees had not filed timely post-trial motions within ten days of February 6, 1998, and since appellant properly filed her praecipe to enter judgment upon the jury verdict on February 18, 1998, we find that the prothonotary erred in refusing to perform his purely ministerial task of entering the judgment.

■ ¶ 18 Nevertheless, we reject appellant's claim that appellees' post-trial motions had to be dismissed because they were untimely filed and, therefore, failed to preserve any issues for action by the trial court (and/or appeal to this court). Whenever a party files post-trial motions at a time when the court has jurisdiction over the matter but outside the ten-day requirement of Pa.R.C.P. 227.1, the trial court's decision to consider the motions should not be subject to review unless the opposing party objects. *Millard v. Nagle*, 402 Pa.Super. 376, 587 A.2d 10, 12 (1991), *affirmed* 533 Pa. 410, 625 A.2d 641 (1993). As stated in *Carlos R. Leffler, Inc. v. Hutter*, 696 A.2d 157, 166 (Pa.Super.1997), "[i]n situations in which a party files post-trial motions out of time and a specific objection is made thereto by the opposing party, the trial court, in deciding whether to rule upon the merits of the motion, must consider the nature of the derelict party's default as well as the resulting prejudice to the objecting party." (citations omitted).

■ ¶ 19 In the present case, appellant did object to appellees' late filing of their post-trial motions. However, the objection was based solely on the fact that the motions were filed thirteen days, not ten, after the jury's verdict. Since the trial court had jurisdiction over the case when appellees filed their tardy motions and appellant has not alleged any prejudice by the trial court's consideration of appellees' post-trial motions, we will not find that the trial court abused its discretion in considering the issues. *Cf., Millard*, 587 A.2d at 12; *Carlos R. Leffler, Inc.*, 696 A.2d at 166–67 (Superior Court found trial court abused discretion in failing to consider the merit of post-trial motions, where motions were filed only one day late and opposing party did not assert any prejudice.).

¶ 20 We turn now to appellant's claim that the trial court erred in awarding a new trial where the grounds asserted by appellees were not raised either during pre-trial proceedings or trial in accordance with Pa.R.C.P. 227.1(b)(1). We reject appellant's claim for two reasons. First, appellant's argument centers upon her allegation that appellees did not properly raise its claim for judgment n.o.v. However, as appellees have not appealed from the lower court's denial of judgment n.o.v., the

question of whether they properly preserved those issues for review is moot. Second, the lower court expressly granted a new trial based upon appellees' claim that the verdict was against the weight of the evidence. Specifically, the court found that the jury's determinations that appellees owed a duty to appellant, that appellees' actions "caused" appellant's injuries and that appellant was not contributorily negligent were against the weight of the evidence. Trial Court Opinion, pp. 6–7. All of these issues were clearly before the jury, addressed during trial and presented to the jury during the court's instructions. Accordingly, appellees raised these issues during trial and could not request the court to grant a new trial on the basis that the verdict was against the weight of the evidence until after the jury rendered its verdict in favor of appellant. Thus, appellees did preserve their claims based upon the weight of the evidence for review. *See Lewis v. Evans*, 456 Pa.Super. 285, 690 A.2d 291, 292 (1997) (Claim that the verdict was against the weight of the evidence was properly preserved for review where party raised issue in post-trial motion; fact that party did not object immediately after the verdict did not waive issue where claim was not based upon an inconsistent, irrational or problematic verdict.).[5]

¶ 21 We now turn to appellant's remaining claims that the lower court erred in granting a new trial on the grounds that the jury's determinations that appellees owed a duty to appellant, that appellees' negligence caused appellant's injuries and that appellant was not contributorily negligent were against the weight of the evidence. When reviewing an attack on the lower court's grant of a new trial, we will not disturb its decision absent an abuse of discretion or clear error of law. *Baldino v. Castagna*, 505 Pa. 239, 243, 478 A.2d 807, 810 (1984); *In re New 12th Ward Republican Club*, 412 Pa.Super. 255, 603 A.2d 205, 208 (1992). Further, as stated by our Supreme Court in *Thompson v. City of Philadelphia*, 507 Pa. 592, 598, 493 A.2d 669, 672 (1985):

> This Court has repeatedly emphasized that it is not only a trial court's inherent fundamental and salutary power, but its duty to grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. *Burchard v. Seber*, 417 Pa. 431, 438, 207 A.2d 896, 899 (1965); *Frisina v. Stanley*, 409 Pa. 5, 7, 185 A.2d 580, 581 (1962); *Kiser v. Schlosser*, 389 Pa. 131, 133, 132 A.2d 344, 345 (1957). Although a new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Burrell v. Philadelphia Electric Company*, 438 Pa. 286, 265 A.2d 516 (1970).

*See also, Dilauro v. One Bala Avenue Associates*, 419 Pa.Super. 191, 615 A.2d 90, 91 (1992); *Read v. Shu*, 419 Pa.Super. 227, 615 A.2d 109, 110 (1992); *In re 12th Ward Republican Club*, 603 A.2d at 207–208. Where the record adequately supports the trial court's reasons and factual basis, the lower court did not abuse its discretion. *Coker v. S.M. Flickinger Co., Inc.*, 533 Pa. 441, 451, 625 A.2d 1181, 1187 (1993). However, if the record discloses that the evidence was merely conflicting, then the new trial order must be reversed, because the

---

**5.** At one point in the trial court's opinion, it stated, "This Court granted a new trial because the verdict was against the weight of the evidence and because this Court finds that the [appellees] did not owe any legal duty to the [appellant] under the facts of this case." To the extent that appellees request this court to enter judgment n.o.v. on the grounds that the lower court found that they could not be liable *as a matter of law* because they owed no duty to appellant, we find that this claim has been waived. Appellees have not appealed from the lower court's denial of their request for judgment n.o.v.

trial court invaded the province of the jury. *Coker*, 625 A.2d at 1187.

¶ 22 With the foregoing standard in mind, our review of the record reveals the following facts: Appellant was a certified elevator mechanic who began working for Amtech in October of 1992. (N.T., Vol.I, p. 34). In October of 1993, appellant was assigned by Amtech to be the full-time elevator mechanic at the building located at 1818 Market Street. She was required to perform regular maintenance on the elevators located in that building. The building has twenty elevators with freight elevators located in shafts number 5 and 10. Maintenance of the elevators included cleaning the machine rooms, cleaning the elevator pits and greasing and oiling the pulleys, also known as "shivs," which carry the cables that drive the elevator cars.

¶ 23 As previously stated, the building at 1818 Market Street was owned by appellee 1818 Market Partnership and was managed by appellee Heitman pursuant to a Management Agreement between appellees. The elevators at 1818 Market were serviced and maintained by Amtech pursuant to a Vertical Transportation Maintenance Agreement entered into on March 6, 1992, between Amtech and Heitman, as agent for 1818 Market Partnership. (N.T., Vol. I, p. 104–105; Exhibit P–37).

¶ 24 The contract between Heitman and Amtech contained the following provision:

### Article XVIII

### Access

It is agreed that Contractor does not assume possession or control of any part of the Units, that such remains Owner's solely as owner, lessee or agent of the Owner or lessee, and that owner is solely responsible for all requirements imposed by any federal, state or local law, ordinance or regulation.

Owner agrees to provide Contractor unrestricted, ready access to all areas of the building in which any part of the Elevators are located and to keep all machine rooms and pit areas free from water, stored materials and excessive debris. Owner agrees to provide a safe work place for Contractor's personnel and to remove any hazardous materials in accordance with applicable laws and regulations.

(Heitman–Amtech Vertical Transportation Maintenance Agreement, Exhibit P–37, p. 8–9).

¶ 25 Appellees stipulated at trial that they controlled the elevator shaft where appellant was injured. (N.T., Vol.I, p. 117–118). Specifically, appellees' trial counsel Louis E. Cheek, Esquire acknowledged on-the-record that appellees controlled the elevator shaft. (N.T., Vol.I, p. 118). Further, the management agreement between Heitman and 1818 Market Partnership provided that Heitman would operate the property in compliance with all state, federal and local laws, rules and regulations. (N.T., Vol. I, p. 112–115; Heitman–1818 Market Partnership Management Agreement, Exhibit P–36, p. 1–2). Prior to January 6, 1994, Heitman had not inspected the ladder in freight elevator shaft number 10 for compliance with federal, state or laws or regulations. (N.T., Vol.I, p. 116).[6]

¶ 26 Prior to appellant's assignment to the building, the elevators were serviced by Amtech mechanic Fran Williams. Williams was the full-time resident mechanic at 1818 Market Street from the Fall

---

**6.** The Occupational Safety and Health Administration ("OSHA") has promulgated regulations governing fixed ladders. One of those regulations, 29 C.F.R. § 1910.27(f), provides: "All ladders shall be maintained in a safe condition. All ladders shall be inspected regularly with the intervals between inspections being determined by use and exposure." The Pennsylvania Department of Labor and Industry has also promulgated regulations governing fixed ladders. 34 Pa.Code § 21.51(j) expressly states: "Ladders shall be inspected frequently and those which have developed defects shall be withdrawn from service for repair or destruction and tagged and marked 'Dangerous do not use.'"

of 1991 until the Fall of 1993. His duties included servicing the freight elevator in shaft number 10. When he first observed elevator shaft number 10, he noticed that the ladder was extremely close to the wall and very difficult to use. He testified that you had to "really hug the ladder" and "you couldn't get a good foot tread on it." (N.T., Vol.II, p. 8). In his years of experience in the elevator industry, Mr. Williams stated that he had never used a ladder as difficult as the ladder in shaft number 10. (N.T., Vol.II, p. 8).

¶ 27 Mr. Williams also testified that in the Fall of 1991, he informed Wayne Vallieu, the building operations manager about his having difficulty getting down the ladder because it was too close to the shaft wall. Vallieu gave Williams permission to use a Heitman employee to assist him whenever he had to access that pit. The employee would pass Williams down his tools and equipment when he went to the bottom of the pit. (N.T., Vol.II, p. 8–10). Williams also told John Wood, the Heitman building engineer, and Tom Flynn, his supervisor at Amtech, about the problems with the ladder when he first viewed the pit in the fall of 1991. Vallieu and Flynn denied that Williams complained to them about the ladder. (N.T., Vol. I, p. 122–123; N.T., Vol. II, p. 93).

¶ 28 Williams testified that the ladder is not part of the elevator equipment installed, maintained or serviced by an elevator mechanic. (N.T., Vol.II, p. 6–7). Williams and Flynn testified that if there was a problem in the building with a ladder in an elevator shaft, they would expect the building owner to repair or fix the problem with the ladder. (N.T., Vol.II, p. 95–96).

¶ 29 For two days in September of 1993, appellant assisted Williams at 1818 Market. Appellant had never worked in the freight elevator shaft where she was injured prior to starting her full-time position at 1818 Market in October of 1993. (N.T., Vol.I, p. 37). Before her injury, appellant had on one occasion replaced light bulbs inside the elevator car which was located in shaft number 10. However, she had never been in the bottom of the pit in shaft number 10. (N.T., Vol.I, p. 39–40).

¶ 30 Appellant had never been cautioned about the ladder in shaft number 10, (N.T., Vol.I, p. 15), and she and Williams had not worked together in shaft number 10, because he expected to be the mechanic servicing the elevators at 1818 Market. However, Williams lost his job with Amtech in September of 1993, and appellant was assigned full-time to the building.

¶ 31 Because the freight elevator in shaft number 10 was extremely busy during the day, appellant had to make arrangements in advance to take the elevator out of service. The elevator was usually taken out of service for two hours during the third week of each month. However, scheduling problems prevented appellant from arranging to service the freight elevator in shaft number 10 until January 6, 1994. (N.T., Vol.1, p. 40).

¶ 32 On January 5, 1994, appellant told Vallieu that it was "essential" that she get into the pit of shaft number 10 to remove newspapers, boxes and papers she could see at the bottom of the shaft. These materials posed a fire hazard. Appellant "begged" to have the car taken out of service and arrangements were made for service on January 6, 1994. (N.T., Vol.I, p. 41).

¶ 33 Appellant reported to work on January 6, 1994, and at approximately 10 a.m., she began to prepare to service the freight elevator in shaft number 10. She parked the elevator, closed the car doors and went to the machine room to get her tool box, a box of rags and a broom. She brought this equipment down to the front of the elevator doors on the subbasement level. (N.T., Vol. I, p. 44–46; Exhibit P–29). Appellant had two hours to complete her work and return the freight elevator to service. (N.T., Vol.I, p. 50).

¶ 34 Appellant opened the doors to the shaft and placed a screw driver underneath the door to hold it open. (N.T., Vol. I, p. 46; Exhibit P–27). This was the first time appellant had viewed the bottom of the shaft from the open subbasement doors. (N.T., Vol. I, p. 47; Exhibit P–28). To gain access to the bottom of the shaft, appellant had to descend a fixed metal ladder attached to the elevator shaft wall. (N.T., Vol.I, p. 39). The distance from the elevator sill at the subbasement opening to the bottom of the shaft is approximately 16 feet (N.T., Vol.I, p. 47). The first three rungs of the ladder have 1½ inches of clearance between the elevator shaft wall and the center point of the rungs. (N.T., Vol. II, p. 33; Exhibit P–25). Below the first three rungs, the wall is slightly offset and the clearance between the shaft wall and the center of the remaining rungs is 2½ inches. (N.T., Vol. II, p. 33; Exhibit P–26). The side rails of the ladder are flush against the wall for the top three rungs. (Exhibit P–25; Exhibit P–27).[7]

¶ 35 After placing the screwdriver on the sill to hold the elevator door open, appellant grabbed the door jam with her right hand and placed her left hand and foot on the ladder. She next swung her right arm and leg onto the ladder and proceeded downward. (N.T., Vol.I, p. 48–49). During appellant's first trip down and up the ladder, she noticed that the ladder was unlike any ladder she had used in other buildings because it was attached against the wall. It did not allow her to put her hands around the side rails and it did not allow for a good foothold. (N.T., Vol.I, p. 49). Nevertheless, appellant did not consider herself to be at risk for falling when she first descended the ladder. Rather, she was more concerned about

completing the maintenance in the two hours allotted by appellees. (N.T., Vol.I, p. 49–50).

¶ 36 When appellant got to the bottom of the elevator shaft, she cleaned up the debris and trash on the elevator pit floor. She determined that she needed to grease the shivs. She climbed up the ladder a couple of rungs and placed her box of trash and broom on the floor where the elevator doors were open. She then climbed up the rest of the ladder and got out of the shaft. (N.T., Vol.I, p. 52).

¶ 37 Appellant then closed the elevator doors and took the other freight elevator to the elevator machine room. She got her grease gun, some rubber gloves and rags. After loading the grease gun with a grease cartridge, she cleaned her hand with the rags, (N.T., Vol.I, p. 53), and prepared to descend the ladder a second time. She described this event as follows:

Q: All right, what step did you take next, what did you do next after you got the tools that you needed.

A: I would open the door again, and put the screwdriver under the sill. And then laid the grease gun across the sill, and rags and anything else I needed. That's where you lay them when you are going down.

Then I reached, I believe I had the gloves in my back, in a pocket or in my waistband, I really don't remember. I just know they were with me. I reached onto the ladder, grabbed a hold of it, and the next thing I remember is just seeing my hands in front of my face and I fell straight down.

(N.T., Vol.I, p. 53–54).

¶ 38 As a result of the fall, appellant fractured her left tibia, fibula, medial mal-

7. OSHA and Pennsylvania Department of Labor and Industry regulations address the required distance between the center of the rungs and fixed objects behind the ladder. OSHA regulation, 29 CFR § 1910.27(c)(4), in pertinent part, provides: "The distance from the centerline of rungs, cleats or steps to the nearest permanent object in back of the ladder shall be not less than 7 inches[.]" The Pennsylvania Department of Labor and Industry regulation, 34 Pa.Code § 21.34(e), in pertinent part, requires: "Distance from front of rungs to nearest permanent object on the climbing side of the ladder shall be not less than 30 inches. Distance from back of rungs to nearest permanent object shall be not less than 6½ inches."

leolus and ankle. She also sustained a comminuted fracture of her left heel and a subtalar joint fracture. (Deposition of Robert Floros, D.P.M., p. 12–22). She underwent open reduction and internal fixation and had metal rods and screws placed in her leg and ankle, some of which remains in her leg today. (Deposition of Vincent Di Stefano, M.D., p. 14). She suffers from a permanent loss of function in her left ankle and heel. She will require a future ankle fusion. Her injuries will limit her activity for the rest of her life, and she is physically unable to return to work as an elevator mechanic. (Deposition of Robert Floros, D.P.M., p. 40–45).

¶ 39 Appellant's vocational expert testified about appellant's limited earning capacity and her economic expert testified that her lifetime loss of earnings ranged from $783,051 to $1,497,839. (N.T., Vol. II, p. 106–113; N.T., Vol. III, p. 11–12). Appellant's past medical expenses amounted to $ 79,615, and her physician estimated her future medical expense would range between $10,000 and $18,000.

¶ 40 Based on the foregoing evidence, the jury unanimously found that appellees were negligent and that their negligence was a substantial factor in bringing about appellant's injuries. Further, the jury found that appellant was not contributorily negligent.[8] The jury then awarded $1,800,000 in damages to appellant for her pain and suffering, loss of income and past and future medical expenses.

¶ 41 We first turn to the lower court's decision that the jury's determination that appellees were negligent was against the weight of the evidence. To reach its conclusion, the jury had to find that appellees owed a duty to appellant that they breached. This inquiry centers upon § 343 and § 343A of the Restatement (Second) of Torts, which provide:

### § 343. Dangerous Conditions Known to or Discoverable by Possessor

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

### § 343A. Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

See Dilauro v. One Bala Avenue Associates, 419 Pa.Super. 191, 615 A.2d 90, 94 (1992) (applying §§ 343, 343A of the Restatement (Second) of Torts).

---

**8.** The verdict sheet indicated that the jury split, four to four, on the question of whether appellant was contributorily negligent. However, the word "no" was written and circled next to that question. The judge then questioned the jury, and the foreperson stated that the actual jury verdict was a vote of seven to one of "no" contributory negligence on appellant's part. It is also significant to note that the verdict sheet indicated that the jury expressly determined that appellant's contributory negligence was not a substantial factor in causing her injuries by a vote of seven to one.

¶ 42 Presently, the lower court found that appellant recognized the dangerousness of the ladder and that Amtech, appellant's employer, had exclusive control over the area where the ladder was located. Thus, the lower court concluded that appellees had no duty to protect appellant from the dangerous condition of the ladder. We must disagree with the lower court's conclusion since it is based upon both a factual conclusion not supported by the record and an erroneous legal analysis of the facts.

¶ 43 First, the lower court's conclusion that appellant's employer Amtech had exclusive control over the elevator shaft is belied by the record. Appellees admitted at trial that they controlled the elevator shaft. (N.T., Vol.I, p. 118). Further, the contract between appellee Heitman and Amtech expressly provided that appellees maintained control over the elevator shafts and would provide a safe work place for Amtech's personnel in accordance with any federal, state or local law, ordinance or regulation. *See* Heitman–Amtech Vertical Transportation Maintenance Agreement, Article XVIII. (Exhibit P–37). Further, the management agreement between appellees Heitman and 1818 Market Partnership provided that Heitman would operate the property in compliance with all federal, state and local laws, rules and regulations. *See* Heitman–1818 Market Partnership Management Agreement, ¶ 2. (Exhibit P–36). Accordingly, the lower court's finding that appellees did not control the elevator shaft in which the dangerous ladder was located is not supported by the record.

¶ 44 Second, we reject the lower court's conclusion that appellees are not liable for appellant's injuries because appellant knew of the obviously dangerous condition of the ladder and failed to protect herself. In finding fault with the lower court's conclusion, we are persuaded by Comment f of § 343A of the Restatement (Second) of Torts which, in pertinent part, provides:

There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitees for his protection. This duty may require him to warn the invitee, or take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.

Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it. Such reason may also arise where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk. In such cases the fact that the danger is known, or is obvious, is important in determining whether the invitee is to be charged with contributory negligence, or assumption of the risk. (See §§ 466 and 469 D.) It is not, however, conclusive in determining the duty to the possessor, or whether he has acted reasonably under the circumstances.
Illustrations:

\* \* \*

5. A owns an office building, in which he rents an office for business purposes to B. The only approach to the office is over a slippery waxed stairway, whose condition is visible and quite obvious. C, employed by B in the office, uses the stairway on her way to work, slips on it, and is injured. Her

only alternative to taking the risk was to forego employment. A is subject to liability to C.

¶ 45 As previously stated, it is clear that appellees controlled the elevator shaft where the dangerous ladder was located. Also, it is clear from the record that the dangerous condition of the ladder was obvious to both appellant and appellees.[9] Likewise, appellees should have realized that the ladder posed an unreasonable risk of harm, especially in light of OSHA and Pennsylvania Department of Labor and Industry regulations concerning inspection and placement of ladders and the fact that Heitman had previously provided an employee to assist the Amtech employee when using the ladder. Thus, appellant proved the requirements of § 343(a) of the Restatement (Second) of Torts, that appellees knew or by the exercise of reasonable care should have discovered the dangerous ladder.

¶ 46 The record also supports the jury's conclusion that appellees should have anticipated that appellant would fail to protect herself against the dangerous condition of the ladder. Appellant was required by the agreement between Amtech and Heitman to perform routine maintenance on the elevator in shaft number 10. To do so, she had to traverse the ladder in that elevator shaft. She had no other alternative to descending and climbing that ladder, and she could only service the elevator during a two hour period once a month. Thus, just as in Illustration 5 in Comment f of § 343A of the Restatement (Second) of Torts, appellees should have anticipated that appellant would use the ladder despite its obviously dangerous condition. Accordingly, we find that appellant met the requirement of § 343(b) of the Restatement (Second) of Torts, i.e., that appellees should have expected that appellant would fail to protect herself from the dangers of the ladder. *See* Restatement (Second) of Torts, § 343A(1).

¶ 47 Next, the record clearly supports the jury's conclusion that appellees failed to exercise reasonable care to protect appellant against the dangers posed by the ladder. As previously stated, appellees knew of the dangerous condition of the ladder and failed to insure that the ladder was hung in compliance with OSHA and Department of Labor and Industry standards. Thus, appellant met the requirement of § 343(c) of the Restatement (Second) of Torts. Since appellant proved each requirement of § 343 of the Restatement (Second) of Torts, appellees are subject to liability under § 343 and § 343 A of the Restatement (Second) of Torts, and the lower court erred when it held that appellees owed no duty to protect appellant from the dangerous condition of the ladder.

¶ 48 Next, we consider the lower court's conclusion that appellees' negligence did not cause appellant's injuries. Again, we must reject the lower court's decision. In making its decision, the lower court apparently ignored the fact that the ladder violated both federal and state safety regulations. Also, the court must have rejected the opinion of appellant's expert that the ladder was inadequate for a person's hand to grasp securely and her feet to find an adequate purchase. In light of that testimony, plus appellant's own testimony that she fell almost immediately after stepping onto the ladder, we cannot agree that the jury's verdict shocks the conscience. Certainly, it was reasonable for the jury to conclude that appellant's

9. Former–Amtech employee Fran Williams testified that he informed Wayne Vallieu, appellees' building operations manager, and John Wood, Heitman's building engineer, about the problems with the ladder. Although Mr. Vallieu testified that Williams had not informed him about the ladder, such a conflict in testimony is for the jury, not the judge, to resolve. Thus, to the extent that the lower court's decision to grant a new trial was based upon a finding that appellees did not know of the danger, we find the lower court erred. *Coker*, 625 A.2d at 1187 (if record discloses evidence was merely conflicting, the new trial order must be reversed).

fall was caused by the ladder's defective condition, i.e., it was attached too closely to the wall for her to stand upon and securely grip. We must reject the lower court's conclusion because it is based upon its own interpretation of conflicting expert testimony, which cannot serve as the basis for a new trial. *Coker*, 625 A.2d at 1187.

¶ 49 The lower court also appears to have granted a new trial based upon its conclusion that appellant's "own negligence caused the injury in question." Trial Court Opinion, p. 7. Specifically, the lower court found that "[i]t was the [appellant's] actions in not taking the same measures to protect herself as earlier mechanics had done and in using the ladder while her hands were greasy enough to cause her to lose her grip which caused the accident." Trial Court Opinion, p. 6. However, once again, our review of the record reveals that the lower court's decision to grant a new trial is not adequately supported by the record. Rather, the lower court has usurped the jury's fact-finding function and supplanted its conclusions with its own version of the facts.

¶ 50 In making its decision, the lower court apparently found as a fact that appellant was carrying tools down the ladder when she fell, rather than having a Heitman employee lower the tools to her. However, this conclusion is not supported by the record. In fact, the record clearly supports the conclusion that appellant was not carrying any tools when she fell. Instead, she testified that her grease gun was laying on the sill of the elevator door when she stepped upon the ladder and immediately thereafter fell. (N.T., Vol.I, p. 54).

¶ 51 Also, the lower court concluded that appellant attempted to climb the ladder while her hands were too greasy for her to securely grip the ladder, and, thus, her own negligence caused her fall. Once again, we find that the lower court's conclusion is, at best, its own interpretation of conflicting evidence. While appellant admitted on cross-examination that greasy hands are a normal part of an elevator mechanic's job (N.T., Vol.I, p. 88), she specifically testified that she cleaned her hand with rags prior to descending the ladder. (N.T., Vol.I, p. 54). Thus, the lower court's conclusion that appellant's hands were "covered" with grease is merely its own factual finding based on conflicting testimony. Such a finding cannot serve as the basis for a new trial. *Coker*, 625 A.2d at 1187.[10]

¶ 52 In sum, we reject the lower court's decision to grant a new trial. Given extensive testimony concerning the obviously dangerous condition of the ladder, appellees' admitted control over the ladder, the lack of an alternative method for appellant to perform her maintenance of the elevator and appellant's testimony that she had cleaned her hands prior to her attempt to descend the ladder, we do not believe that the jury's verdict is so contrary to the evidence as to shock one's sense of justice. Rather, the award of a new trial was based upon the lower court's own interpretation of the conflicting evidence, which cannot serve as a basis for a new trial. More to the point, the specific reasons cited by the lower court for the grant of a new trial lack merit. Accordingly, we reverse and remand for reinstatement of the jury's verdict.[11,12]

---

10. It is also significant to note that appellant's expert testified that the ladder in question was positioned such that even a person with perfectly dry hands would lose his or her grip and fall if that person's feet slipped from the ladder. (N.T., Vol.II, p. 73). The expert also testified that given the nature of appellant's injuries to her lower extremities, it was likely that appellant's feet slipped from the ladder's rung first and her hands followed as she fell straight down the elevator shaft. (N.T., Vol. II, p. 44–45).

11. Appellees submit that if we find the lower court's specific grounds for awarding a new trial to be without merit, then we can affirm its decision based upon other grounds, to-wit: the lower court erred when it sustained appellant's objection to a question that appellee Heitman asked of its expert; the trial court

¶ 53 Order granting new trial is reversed. Case remanded for further proceedings in accordance with the provisions of this opinion. Jurisdiction relinquished.

¶ 54 BECK, J. Concurs in the Result.

erred in its response to a question from the jury regarding appellant's projected earnings; and the trial court improperly commented on the condition of the ladder. However, "if the trial court specifies the reasons for which it ordered a new trial, then an appellate court can only affirm the decision if at least one of the reasons specified is an adequate one." *Coker*, 625 A.2d at 1187. Since the trial court specifically cited the reasons for granting a new trial and we found those reasons lack merit, we will not order a new trial based upon "other" grounds where the trial court did not expressly adopt those reasons. *Coker*, 625 A.2d at 1187.

12. Appellees argue that if we reverse the trial court's award of a new trial, the lower court should be permitted to rule upon its remittitur request. We agree and direct the lower court to rule upon appellees' motion for remittitur. Thereafter, the lower court should determine the amount of delay damages to which appellant is entitled, and final judgment should then be entered.